The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioners denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in the I.C. Form 21, Agreement for Compensation, which was approved by the Commission on July 6, 1992, in their Pre-Trial Agreement which was filed on February 23, 1998, which are incorporated herein by reference, and at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured, with ESIS as the servicing agent.
3. An employee-employer relationship existed between the parties at all relevant times.
4. The plaintiff sustained an admittedly compensable injury on May 15, 1992, as a result of which the parties entered into the Form 21 Agreement.
5. The plaintiffs average weekly wage was $513.57, which yields the maximum compensation rate of $342.40 per week for the year of injury.
6. The issue for determination is whether the plaintiffs fibromyalgia condition is a natural consequence and complication that resulted from her admittedly compensable May 15, 1992 injury, and if so, to what benefits may she be entitled under the Act.
7. The parties stipulated the following documents into the record:
a. I.C. Form 18, which was dated May 13, 1993;
b. I.C. Form 19, dated May 27, 1992;
c. May 28, 1995 letter of plaintiffs attorney; and
d. Medical records, 218 pages.
8. Plaintiff received $6,266.00 in short-term disability benefits through an employer-funded plan.
9. Plaintiff received $11,139.99 in long-term disability benefits from an employer-funded plan, through October 31, 1998. Under this plan she is entitled to receive $259.00 per month until May 31, 2020, and $172.71 per month until June 20, 2020.
 ***********
Based upon all of the competent evidence of record, and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing, the plaintiff (born on October 20, 1955) was a 42-year-old female who had obtained a G.E.D. She had lived in the same residence in Cooleemee, North Carolina all her life. She was married and had two grown daughters and a 10-year-old son. She completed EMT training and fire training while employed with the defendant-employer. She began working in textiles at age sixteen and for the following 21 years until her admittedly compensable injury was never without a job.
2. The defendant-employer hired plaintiff in 1987. Thereafter, plaintiff became a spin draw operator. She worked 12 hour shifts, with each work week consisting of three or four workdays. Her machine was situated on three levels. Plaintiff dropped a pack of yarn into the slot on the machine at the third or top level. The yarn processed through the machine on the second floor and ran it through to the first floor, where plaintiff would remove or doff the finished yarn. The doffed cakes of yarn weighed between thirty-five to sixty pounds, depending on the type of yarn being run. Plaintiff was required to climb stairs between the three levels in order to perform her job.
3. On May 15, 1992, plaintiff suffered an admittedly compensable injury to her back when she bent over to repair a broken thread line. She leaned over with an air gun and her "back popped. She finished the doff and then sat in the break room for approximately fifteen minutes. When she tried to get up, she could not. She was treated at the emergency room of Rowan Memorial Hospital. She was diagnosed with an acute muscle strain.
4. Plaintiff returned to work on May 28, 1992, but continued to suffer persistent pain, soreness and tenderness in the area of her injury. She was still experiencing a lot of pain when she walked and moved. As plaintiff illustrated at the hearing before the Deputy Commissioner, the pain was in the lower left portion of her back and ran down to the upper portion of her buttocks. Following her return to work, plaintiff did not perform her job as she had prior to the May 15, 1992 accident. Her co-workers helped her by doing much of the work on the third floor and by doffing the heavy cakes of yarn on the first floor.
5. On June 23, 1992, after being informed of her continuing persistent pain, Dr. Demming Ward kept plaintiff on Motrin, 400 milligrams, 3 to 4 times per day. Plaintiff was scheduled to be out of work for three weeks due to her departments being shut down and some vacation time. Plaintiff and Dr. Ward hoped that the additional three weeks out of work, plus the Motrin, would allow plaintiff to recover.
6. On July 18, 1992, plaintiff returned to work, but was only able to work for two days. Plaintiff was then taken out of work due to a viral infection. On July 23, 1992, she complained to Dr. Gamble of "soreness running down the left side of her neck extending down to her upper chest region and that it "hurts almost with any movement . . . Plaintiff had point tenderness "from the posterior region of [her] ears, extending down to the cervical region and left upper breast region. Dr. Gamble thought plaintiff might have a mild muscle pull and gave her Anaprox samples. She reported to Dr. Gamble that her muscle ache was much improved at her July 28, 1992 visit, and he allowed her to return to work on July 31, 1992, which she did.
7. After plaintiff returned to work on July 31, 1998, she worked seven or eight days until on or about August 8, 1992. During this period, she was still experiencing some "nagging pain in her back, lower hip, and leg. On or about August 8, 1992, plaintiff worked extremely hard, and in addition to her regular work, assisted during a fire drill by carrying fire extinguishing equipment. Plaintiff had point tenderness "in the left cervical region extending down to her shoulder on August 11, 1992, and she was again taken out of work by Dr. Gamble.
8. On August 14, 1992, plaintiff called Dr. Gambles office, complaining of severe pain in her left shoulder. On August 17, 1992, she was examined by Dr. Gamble. She complained of "persistent left shoulder pain, neck pain, now proceeding to the right shoulder and neck region. During his exam, Dr. Gamble noted her cervical region was very tight, "with areas of muscle spasm noted in the left and right side, now extending to the shoulder regions bilaterally.
9. Dr. Mason examined plaintiff on August 20, 1992, and she reported "considerable problems with pain in her left shoulder and she is now even beginning to have problems with pain in her right shoulder. On August 25, 1992, she stated to Dr. Mason that she felt worse, and was now having pain in the "area of the costal cartilage on the left. Plaintiffs condition continued to deteriorate and on September 21, 1992, Dr. Mason referred her to a rheumatologist.
10. Dr. Senter, the rheumatologist to whom she was referred, first examined plaintiff on October 22, 1992. Dr. Senter took an extensive history from plaintiff. The history given by plaintiff accurately reflected her 21 year uninterrupted work history. The history stated: "This lady apparently was quite well until May 15, 1992 when, while at work, she bent over to do her routine job. She simply could not get up because of pain in the left side of her back. Following his initial examination, Dr. Senter was uncertain of a diagnosis, but was concerned that she may have a cervical spine lesion, a disc, cyst or tumor. He ordered several tests and xrays.
11. On December 2, 1992, Dr. Senter tentatively diagnosed post-traumatic fibromyalgia and a vitamin B-12 deficiency. From December 2, 1992, through March, 1993, Dr. Senter continued to treat plaintiff for post-traumatic fibromyalgia and vitamin B-12 deficiency while at the same time continuing diagnostic tests to rule out other causes of her problems.
12. By March 4, 1993, plaintiffs husband was sick and plaintiff was "pretty desperate to go back to work because she does not know when her husband is going to go back to work, and there is no income. Dr. Senter attempted to return plaintiff to light duty work beginning March 10, 1993 even though plaintiffs left leg had recently gotten so bad that she could barely walk. However, the employers nurse would not allow her to return to work because she was still having a little trouble walking and she could not pull or push.
13. By April 15, 1993, Dr. Senter had ruled out other possible diagnoses and was treating plaintiff for fibromyalgia. Dr. Senter noted that her most severe symptoms were on her left side and that she was very tender over the posterior pelvis, in the buttock and over the greater trochanteric bursa on the left. Dr. Senter then stated: "It is very discouraging that she has not responded to treatment, but I think at least we have cleared up what the problem is, that it is simply very severe post-traumatic fibromyalgia.
14. In his June and August, 1993 exams, Dr. Senter noted and the Full Commission finds as fact, that plaintiffs pain was spreading to the right side, just like she had on the left.
15. Plaintiff searched for work on her own with a different employer in October, 1993. In November, 1993, Dr. Senter allowed plaintiff to return to full duty work, but restricted her to six hours a day, rather than a normal 12 hour shift. After working for approximately three weeks, plaintiff had a great deal of tenderness and soreness. She was having trouble walking because of the pain in her low back. Dr. Senter was of the opinion that plaintiff had given work a good try, but that she should not return because it would continue to worsen her symptoms.
16. When Dr. Senter spoke with plaintiff regarding putting her on disability, plaintiff became tearful and depressed. After taking plaintiff out of work for one week, Dr. Senter again returned plaintiff to work, with a limit of six hours per day, beginning December 17, 1993. In a letter to the employers rehabilitation nurse, to assist plaintiff in returning to work, Dr. Senter stated, in part: "Following is the information you had requested for Ms. Browns employer before she begins to work on Friday, December 17, 1993. I have been treating her for post-traumatic fibromyalgia with pain in the low back and hip area on the left following an injury which she sustained on her job. Subsequently, the painful muscle spasms spread to involve most of the entire back, including the upper back and neck.
17. In January, 1994, plaintiffs work hours were increased from six hours per shift to eight hours per shift. It then became Dr. Senters understanding that plaintiff was going to have to increase her hours to 12 hours per shift. Dr. Senter was pessimistic regarding plaintiffs ability to work 12 hours a day. "As best I can tell from talking with the patient and the rehabilitation nurse, if she is not able to work 12 hours (and I dont think she will be), her only option would be to go out on Disability. I think that is a terrible waste of a good worker, and it would be devastating emotionally and, I think, subsequently physically to this particular patient.
18. On behalf of the plaintiff, Dr. Senter toured the employers facility to determine if there was a job plaintiff was capable of performing. He determined there was not, and again made the decision to take plaintiff out of work. Dr. Senter discovered during his tour of the Celanese plant, when he spoke with the human resources supervisor and read other supervisor and co-employee reports, that plaintiff was under reporting her pain and discomfort to him and that it was actually more difficult for her to continue working then she had allowed him to know.
19. After Dr. Senter toured the Celanese plant, he spoke with plaintiff about applying for disability. He told her that he did not think she had a choice, but plaintiff was still extremely resistant to the idea of going on disability.
20. Dr. Senter kept plaintiff out of work from February 17, 1994 until September 18, 1994. During that time, Dr. Senter wrote to the disability carrier regarding plaintiffs condition, stating that plaintiff had post-traumatic fibromyalgia related to her May 15, 1992 injury at work. Dr. Senter stated that her fibromyalgia was worsened by her worry over finances and her inability to work. He stated that her fibromyalgia symptoms worsened as time went on and spread to other parts of the body, including the upper parts of her back. He concluded his letter by stating: "If we had not already tried, almost heroically, to get her back to work, at a time when she desperately wanted to go back to work and we failed, from my point of view, from her point of view and her employers point of view. I think it is quite clear that the lady is disabled.
21. In one last attempt, Dr. Senter returned plaintiff to work on September 19, 1994. She worked 12 hour shifts in the lab, which consisted of light duty work. She was taken out of work on September 30, 1994, initially due to an asthma attack. Due to her fibromyalgia, Dr. Senter would not return her to work. On March 11, 1996, Dr. Senter noted during an office visit that plaintiffs "main pain is in the posterior pelvis and left leg where it started with her injury.
22. Dr. Senter received his medical degree from Johns Hopkins University School of Medicine. He is board certified in rheumatology and internal medicine. Dr. Senter has been practicing for over 25 years. During that time he has treated between 3,000 and 5,000 patients with fibromyalgia. During his practice, Dr. Senter has seen many cases in which a traumatic event, such as surgery or an accident, has precipitated or triggered the onset of fibromyalgia. He has seen cases of post-traumatic fibromyalgia in which there has been no litigation, and no secondary gain or a third party upon whom to make a claim.
23. At the time of his deposition, Dr. Senter had been treating plaintiff for almost six years. It is the opinion of Dr. Senter that there is a causal connection between the May 15, 1992 compensable injury and the onset of plaintiffs disabling fibromyalgia. The Full Commission finds that the compensable injury was a proximate cause of plaintiffs disabling fibromyalgia.
24. Dr. Rice obtained his medical degree from the University of Miami and is board certified in rheumatology and internal medicine. He has practiced for over 20 years and is on the faculty of the Duke University Medical Center. Dr. Rice helped author "The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability.
25. Dr. Rice examined plaintiff one time and reviewed the medical records which were submitted into evidence. Dr. Rice concurs with Dr. Senters diagnosis that plaintiff suffers from fibromyalgia. Dr. Rice disagrees with Dr. Senters opinion that there is a causal connection between the May 15, 1992 compensable injury and the onset of plaintiffs disabling fibromyalgia.
26. Dr. Rice states that in all the years of his practice he has never seen a patient allege post-traumatic fibromyalgia who is not in a compensation related matter.
27. Dr. Rices experience of never seeing a patient with trauma induced fibromyalgia is contrary to the experience of Dr. Senter and Dr. Lapp, both of whom have seen patients with trauma induced fibromyalgia who were not in a compensation, secondary gain or litigation setting.
28. It is Dr. Rices opinion that if you look closely at the prior medical records of an individual claiming trauma induced fibromyalgia, you will find evidence that the fibromyalgia actually preceded the traumatic event and that the symptoms have expanded over time. Specifically, Dr. Rice states that you will find evidence of headaches, disturbances in bowel function and other preceding complaints.
29. Contrary to Dr. Rices stated opinion, in reviewing plaintiffs prior medical records, Dr. Rice did not find evidence of headaches, disturbances in bowel function, or other preceding complaints. Dr. Rice found no evidence showing the onset of fibromyalgia prior to May 15, 1992.
30. Dr. Rice bases his opinion that there is no causal connection between plaintiffs injury and her subsequent fibromyalgia on a belief that in the literature there is "no proven cause-and-effect relationship between injury or trauma and subsequent symptoms of fibromyalgia. The literature does not support Dr. Rices opinion. See Rice deposition, Exhibit 3 titled "Increased Rates of Fibromyalgia Following Cervical Spine Injury (21.6% of patients in the study who had a single event soft tissue neck injury developed fibromyalgia even though none of the patients had a chronic pain syndrome prior to the trauma); Exhibit 4 titled "Does Fibromyalgia Qualify as a Work Related Illness or Injury (trauma, surgery and infection have been noted in association with the development of fibromyalgia. A work association would be most likely in those individuals with a documented work-related trauma or surgery preceding the development of fibromyalgia); Exhibit 5, titled "Reactive Fibromyalgia Syndrome (29 of 127 patients (23%) diagnosed with fibromyalgia reported having trauma, surgery or a medical illness prior to the onset of fibromyalgia); see also Rices rebuttal deposition, Exhibit 1, titled "Post-traumatic Fibromyalgia: A Case Report Narrated by the Patient (Case report suggests that there is such an entity as post-traumatic fibromyalgia, and that central nervous system plasticity plays a central role.) (Although the notion of post-traumatic fibromyalgia has many critics, it is hard to dispute the causal relationship between the sudden onset of back pain and the subsequent development of fibromyalgia in the case presented); and Exhibit 2, titled "The Fibromyalgia Problem ("Fibromyalgia is obviously associated with trauma. The question is whether trauma can cause fibromyalgia or whether other factors such as pain behavior, societal enhancement or psychosocial factors are the overwhelming causes. Against the trauma factor some physicians and insurance companies stand with their fingers irrevocably wedged in the dike to prevent a deluge of post-traumatic fibromyalgia, thereby cutting off debate. But Buskila and colleagues have recently shown that persons with cervical spine injuries develop fibromyalgia at 12 times the rate of those with fractures of the lower extremity — thus supporting the notion that trauma and fibromyalgia can be causally associated.)
31. Dr. Charles Lapp is a graduate of the Albany Medical College. He is board certified in internal medicine and pediatrics. He has been in practice for 20 years. His practice focuses on the treatment of fibromyalgia and chronic fatigue syndrome. He is certified to give independent medical examinations. Dr. Lapp examined plaintiff and reviewed the medical records which were submitted into evidence. Dr. Lapp concurs with Dr. Senters and Dr. Rices diagnosis that plaintiff suffers from fibromyalgia.
32. Dr. Lapp agrees with Dr. Senters opinion that there is a causal connection between the May 15, 1992 compensable injury and the onset of plaintiffs disabling fibromyalgia. Dr. Lapp opined that plaintiff suffered from fibromyalgia and that the first event leading to the fibromyalgia was the May 15, 1992, injury to her back and hip. Dr. Lapp, in agreement with both Dr. Senter and Dr. Rice, opined that the July, 1992, viral infection was not a cause of the fibromyalgia. Dr. Lapp, again in agreement with Dr. Senter and Dr. Rice, was of the opinion that the August 6, 1992 incident was not the cause or precipitating event of plaintiffs fibromyalgia.
33. Dr. Lapp provided a common sense explanation for selecting the May 15, 1992 injury as the causal link to plaintiffs fibromyalgia. He stated that in retrospect, we can follow plaintiffs symptoms back to their source, much like we can follow the beam of light from lighthouse back to its source. Dr. Lapp noted that plaintiff was symptom free prior to May 15, 1992, but had multiple symptoms of fibromyalgia following May 15, 1992. Similarly, plaintiffs pain migrated from a localized area (the lower back and hip area of the May 15, 1992 injury) to a more generalized area (all four quadrants of the body), but can be traced back to the area of the original injury, where the symptoms remain most severe.
34. "The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability states that the "cause(s) of [fibromyalgia] are incompletely understood. There may be events reported by the patient as precipitating and/or aggravating, including physical trauma, emotional trauma, infection, surgery, and emotional or physical stress. In determining the relationship between [fibromyalgia] and antecedent events, the physician should consider the patients opinion, and review the events and pertinent collateral information, including current and past medical and psychosocial history. The chronology of symptoms should be documented.
35. Dr. Senter, in arriving at his opinion that the May 15, 1992 injury at work was the initial causal event in the onset of plaintiffs fibromyalgia, followed the guidance of the Consensus Report in arriving at his conclusion. He documented the chronology of symptoms. He considered the opinion of the patient. He reviewed pertinent events and collateral information, including past medical history. He obtained tests and experimented with treatments, which ruled out other possible causes of plaintiffs symptoms.
36. Since Dr. Rice did not find a prior history of headaches, disturbances in bowel function, or other preceding complaints which normally support his opinion that there is not a relationship between trauma and fibromyalgia, and because Dr. Rice has never found, in his 20 plus years of practice, a causal relationship between trauma and the onset of fibromyalgia, and because Dr. Rice erroneously assumed that plaintiff on several occasions voluntarily removed herself from work by stating "I just cant do it (see Rice deposition, p. 70), the opinion of Dr. Rice is not given the same weight or credibility as the opinion of plaintiffs treating physician, Dr. Senter.
37. The Full Commission finds as a fact that the opinion of Dr. Senter, as corroborated by Dr. Lapp and supported by several medical journal articles, that the May 15, 1992 compensable injury was the initial triggering event which led to the onset of her fibromyalgia is more credible and entitled to more deference then the opinion of Dr. Rice.
38. Plaintiffs fibromyalgia and resulting disability are causally related to the admittedly compensable injury by accident suffered on May 15, 1992.
39. As a result of her compensable injury, plaintiff was unable to earn any wages from August 11, 1992 through November 14, 1993 and thus is entitled to full wage loss compensation for that time.
40. As a result of her compensable injury, plaintiff was unable to earn her full prior wage from November 15, 1993 through December 8, 1993, and thus is entitled to partial wage loss compensation for that period of time.
41. As a result of her compensable injury, plaintiff was totally unable to earn wages from December 9, 1993 through December 16, 1993.
42. As a result of her compensable injury, plaintiff was unable to earn her prior full wage from December 17, 1993 through February 16, 1994.
43. As a result of her compensable injury, plaintiff was unable to earn her prior full wage from February 17, 1994 through September 18, 1994.
44. As a result of her compensable injury, plaintiff has been unable to earn her prior full wage from from October 1, 1994 through the date of the hearing before the Deputy Commissioner, and such disability is likely to continue into the future indefinitely.
45. As a result of her compensable injury, plaintiff will require medical treatment and prescription medication through an indefinite period in the future.
 ***********
Based, on the foregoing findings of fact and conclusions of law, the Full Commission reaches the following additional:
 CONCLUSIONS OF LAW
1. On May 15, 1992, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of employment.
2. Plaintiffs fibromyalgia was a natural consequence and complication that resulted from her May 15, 1992 compensable injury.
3. As a result of her compensable injury, plaintiff was partially unable to earn wages from November 15, 1993 through December 8, 1993 and from December 17, 1993 through February 16, 1994. Plaintiff is entitled to receive partial wage loss benefits for the period of time in which she was partially disabled from earning wages. N.C. Gen. Stat. 97-30.
4. As a result of her compensable injury, plaintiff was totally disabled to earn wages from: (a) August 11, 1992 through November 14, 1993; (b) December 9, 1993 through December 16, 1993; (c) February 17, 1994 through September 18, 1994; and (d) October 1, 1994 through the present and continuing. Plaintiff is entitled to receive total disability benefits for the period time in which she was and remains totally disabled from earning wages, and continuing until further order of the Industrial Commission allowing defendant to cease payment of total disability compensation. N.C. Gen. Stat. 97-29.
5. Plaintiff is entitled to payment of all medical expenses incurred as result of her injury on May 15, 1992, including expenses incurred as a result of the examinations and treatment rendered by Dr. Gordon Senter, for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or will lessen her period of disability. N.C. Gen. Stat. 97-2(19); N.C. Gen. Stat. 97-25.
6. Defendant is entitled to a credit against the compensation due to plaintiff under paragraphs 3 4 of these Conclusions of Law. Defendant shall receive a dollar-for-dollar credit for all short-term and long-term disability benefits plaintiff received from August 11, 1992 through October 31, 1998. The credit due defendant beginning November 1, 1998 shall be a dollar-for-dollar credit (currently anticipated as being $259.07 per month) for so long as plaintiff is receiving long-term disability benefits and compensation benefits are paid under this order, or until May 31, 2020, whichever comes first. Twenty-five percent of all past and future credits allowed defendant under this order shall be paid to plaintiffs attorney. Evans v. ATT Technologies, 332 N.C. 78,418 S.E.2d 503 (1992); Church v. Baxter Travenol Laboratories,104 N.C. App. 411, 409 S.E.2d 715 (1991).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff partial disability benefits based on a compensation rate of $342.40 per week from November 15, 1993 through December 8, 1993 and from December 17, 1993 through February 16, 1994. Within two weeks of this order, defendant shall provide plaintiff a statement of plaintiffs earnings for the relevant period. Within three weeks of this order, the parties shall submit a stipulation as to the amount of partial disability benefits which have accrued and should be paid in a lump sum. If the parties are unable to stipulate as to the amount of the partial disability benefits to be paid they shall notify the undersigned prior to the time the stipulation is due.
2. Defendant shall pay plaintiff temporary total disability compensation at the rate of $342.40 per week from August 11, 1992 through November 14, 1993, and from December 9, 1993 through December 16, 1993, and from February 17, 1994 through September 18, 1994, and from October 1, 1994 and continuing until further order of the Industrial Commission allowing defendant to cease payment of temporary total disability compensation. To the extent that this amount has accrued, it shall be paid in a lump sum, subject to the credit due defendant and the attorneys fee approved for plaintiffs attorney.
3. Defendant shall pay all medical expenses incurred as result of her injury on May 15, 1992, including expenses incurred as a result of the examinations and treatment rendered by Dr. Gordon Senter, for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or will lessen her period of disability.
4. Defendant shall receive a dollar-for-dollar credit for all short-term and long-term disability benefits plaintiff received from August 11, 1992 through October 31, 1998. The credit due defendant beginning November 1, 1998 shall be a dollar-for-dollar credit (currently anticipated as being $259.07 per month) for so long as plaintiff is receiving long-term disability benefits and compensation benefits are paid under this order, or until May 31, 2020, whichever comes first. Twenty-five percent of all past and future credits allowed defendant under this order shall be paid to plaintiffs attorney.
5. A reasonable attorneys fee of 25 percent of all accrued and future benefits to be paid to plaintiff, calculated after allowing defendant the dollar-for-dollar credit, is approved for plaintiffs attorney. This amount shall be paid directly to plaintiffs attorney.
6. Defendant shall pay the costs, including expert witness fees.
This 19th day of April 2000.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
S/_______________ DIANNE C. SELLERS COMMISSIONER